IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LARRY JOE ANDERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:08CV627-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Larry Joe Anderson brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record, the court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

On June 6, 2005, plaintiff filed an application for disability insurance benefits, alleging that he was disabled as of May 11, 2005 due to constant pain. (R. 63). On August 16, 2007, after the claim was denied at the initial administrative level, an ALJ conducted an administrative hearing by video teleconference.[1] The ALJ rendered a decision on September

---

[1] The ALJ was in Fort Lauderdale, Florida. The claimant, his attorney, and the vocational expert appeared in Montgomery. The medical expert testified by telephone. (R. 17).

26, 2007. The ALJ determined that plaintiff suffered from a severe combination of impairments, specifically "back disorder and back and neck pain." (R. 19). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings." He further determined that plaintiff retained the residual functional capacity to perform the full range of medium work and, therefore, that he could perform his past relevant work as a furnace operator, both as it is generally performed in the national economy (at the medium exertional level) and as plaintiff actually performed it (at the light exertional level). Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On June 12, 2008, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff was born on October 11, 1945, and was fifty-nine on May 11, 2005, his alleged onset date. Dr. Lucille Collins, a family practitioner, treated plaintiff for various complaints beginning in March 1999. On February 24, 2005, plaintiff complained of back pain due to an injury forty years previously; he told her that he did not want surgery or injections, but only wanted pain control. (R. 103). Dr. Collins noted plaintiff's "illegal use of pain + sleep meds," and sent him for an MRI that same day. The MRI revealed "[a] tiny left-sided annular tear at L3-4 though this does not result in significant mass effect on adjacent structures . . . . Tiny central disc protrusion at L4-5 though this does not result in significant mass effect on adjacent structures . . . [and] degenerative changes at L5-S1 with mild to moderate encroachment of the exiting right L5 nerve root, but no other findings of significance at this level." (R. 124).

Dr. Collins prescribed Darvocet and Sonata. She scheduled plaintiff for electromyography and nerve stimulation studies with Dr. Reuben Richardson on April 5, 2005, and Dr. Richardson noted "normal NCV of both lower ext[remities]" and "[s]ubtle changes are noted to suggest [left] L5 + [right] S1 root irritation. (R. 87-88). On March 5, 2005, plaintiff apparently saw another physician at Dr. Collins' clinic; the doctor prescribed

Lortab (5 mg) and told plaintiff to follow up with Dr. Collins and an orthopedist. (R. 101). On March 14, 2005, plaintiff called Dr. Collins' office and reported that he was out of the Lortab he had been prescribed on March 5, because he had taken them two at a time. Dr. Collins prescribed Lortab (10 mg). Dr. Collins continued to prescribe Lortab for plaintiff and, on May 16th, scheduled him for an appointment the following day with Dr. Medha Pradhan of Southern Pain Control Center. (R. 97-99). Dr. Collins' office called and spoke with plaintiff's wife, Reather, about the appointment time. According to the office note, she said "this was B - - - S - - t. He just needed something for pain." (R. 97).

> The following day, Dr. Pradhan sent a letter to Dr. Collins, stating:
>
> Thank you for your referral of Larry Joe Anderson. Mr. Anderson was in our office today, unfortunately he did not stay for the examination. He went to Baptist South instead of Baptist East and was late for his appointment. Therefore he had to wait 30-40 minutes after the forms were filled out. He left the office stating that he could not wait any longer.

(R. 98). On June 6, 2005, plaintiff told Dr. Collins that he did not have the resources to follow up with pain management as she had recommended. Dr. Collins indicated that "[w]e will just try to maintain him on pain meds." She prescribed Lortab 10mg, 90 pills, to be taken three times a day. (R. 97). Eighteen days later, plaintiff had used all of the Lortab. He told Dr. Collins that he had to leave the pain specialist's office "due to exacerbated pain." Dr. Collins noted, "This patient refuses injections as well. He wants to switch his pain contract to Walmart in Clanton." Dr. Collins arranged to reschedule the appointment with Dr. Pradhan, and to "explain[] that he can't sit for long periods and inquire about payments due to limited income." Dr. Collins' office scheduled the appointment for July 1, and notified the plaintiff. (R. 96). A note dated June 30, 2005 states:

> Reather called and asked to have Larry's appt cancelled with Southern Pain. She states they will not set up a payment plan and they do not have the money to pay cash. Called Southern Care to cancel appt and was told Reather called this morning to see if they were going to give Larry an injection. She was told they would evaluate him [and] the doctor would decide on what meds he was to have. She refused. They do work with pts on a payment plan. Nurse stated they were looking for medications and not the help of a doctor. Cancelled the appointment.

(R. 95). Dr. Collins' office called in a Lortab 10 mg refill order to the Walmart in Clanton on July 5th and September 2nd. (R. 94-95). Dr. Collins prescribed Lortab 10 mg again on September 30th and Doxepin on October 14th after office visits, and her office called in a Lortab prescription on October 28, 2005. (R. 93-94). Dr. Collins saw plaintiff on November 15, 2005, when he had developed otitis media and sinusitis after working outdoors. (R. 92). Although Dr. Collins' notes do not reflect any office examinations after November 15, 2005, her office continued to call in Lortab 10 mg prescriptions each month and Doxepin prescriptions periodically to the Clanton Walmart until August 25, 2006. (R. 91-92, 143-45). On March 9, 2006, four months after she last examined plaintiff, Dr. Collins completed "disability paperwork" and sent it to plaintiff's attorney. (R. 90, 130-34).

On May 11, June 9, and July 7, 2006 – while Dr. Collins' office was still calling in Lortab 10mg prescriptions to the Clanton Walmart – Dr. Nicholas Pantaleone called in prescriptions for plaintiff for Lortab 7.5 mg to the CVS in Clanton.[2] Dr. Pantaleone saw plaintiff in office visits on July 6th and October 5, 2006; in 2007, he saw plaintiff on January 3rd, March 20th, and June 29th. In March 2007, he also completed disability claims forms

---

[2] Dr. Pantaleone had seen plaintiff once three years earlier – on April 10, 2003 – for complaints of low back pain. (R. 149)

5

for plaintiff's attorney.  (R. 139-42, 147).

Although their assessments varied slightly, both Dr. Collins and Dr. Pantaleone indicated that plaintiff experiences pain which would preclude him from working for an 8-hour workday at even a sedentary exertional level.  Dr. Pantaleone based his conclusions, in part, on "extensive end plate degenerative change" in plaintiff's neck,[3] muscle spasms in plaintiff's neck and lower back, the MRI, and medication which causes drowsiness and somnolence.  He concluded that plaintiff had been in this condition since May 12, 2005, his last day of work.[4]  Dr. Collins wrote:

> Patient complains of low back pain which prevents him from getting up and down from squatting position and prevents him from lifting, pushing and pulling. Objectively he is able to squat and stand, has negative straight leg raises, toe and heel walking broad based but otherwise [within normal limits.] Limited foreward [sic] bending.

(R. 131). She further states, though, that he has "degenerative disc [disease] with encroachment of right L5 nerve root," and that he has "significant pain and requires medication which has side effects of sleepiness and slowed responses." (R. 133-34).

Plaintiff argues that the ALJ erred by rejecting the opinions of Dr. Collins and Dr. Pantaleone, plaintiff's treating physicians, and in his assessment of plaintiff's subjective complaints of pain.  The court concludes that the ALJ's decision must be reversed and this

---

[3] X-rays taken on January 17, 2007, when plaintiff sought emergency room treatment after a fall, showed "extensive end-plate degenerative change at C6-C7 with decreased intervertebral disc space height" in addition to a broken nose.  (R. 137).

[4] As the Commissioner argues, although Dr. Pantaleone first examined plaintiff in April 2003, he did not again examine him until more than a year after the May 2005 onset date he put on the disability questionnaire.

case remanded to the Commissioner for further administrative proceedings because the transcript of the administrative hearing is inadequate to support the ALJ's decision. Specifically, the court is unable to determine whether the medical expert actually testified in the manner attributed to him in the ALJ's decision. In rejecting the plaintiff's complaints of pain and the treating physician's opinions, the ALJ relied largely on the hearing testimony of the medical expert, Dr. Brovender, giving that testimony "great weight." The ALJ stated:

> During the hearing the orthopedic medical expert testified via speaker telephone that the claimant's objective medical findings did not corroborate the degree of severity that he was alleging. Dr. Brovender noted that the MRI in 2005 and x-rays in 2007 showed no significant findings. There were only subtle changes on the EMG in Exhibit 1F.
>
> It is noted that the claimant has been treated by Dr. Pantaleone, who has continued to prescribe hydrocodone for the claimant. The medical expert testified that such medication was highly addictive and the claimant had been on it for several years.
>
> * * * * *
>
> The undersigned discounts the assessments of both Dr. Pantaleone . . . and Dr. Collins[.] In fact, Dr. Collins restricted the claimant even more than Dr. Pantaleone, which indicates to the undersigned that they were responding primarily to the subjective complaints of the claimant, who has been treated symptomatically with narcotic medication on a fairly long term basis. This was something Dr. Brovender did not feel the relatively mild objective findings warranted. . . . .

(R. 22). The ALJ further stated:

> The undersigned had a knowledgeable impartial orthopedic medical expert who had thoroughly reviewed the objective findings in the record and who had concluded the claimant's subjective complaints far exceeded the objective medical tests that had been performed on Mr. Anderson. In fact, Dr. Arthur Brovender, the orthopedic medical expert, testified via telephone that he was not at all impressed with the objective medical findings. . . .

> . . . [T]he undersigned has given great weight to the opinions of Dr. Brovender, an orthopedist, who is more qualified to assess orthopedic complaints than a family doctor who appeared to be responding solely to the claimant's request for narcotic pain medication.

(R. 23).

The court does not reach the question of whether Dr. Brovender's testimony would constitute good cause – considered in conjunction with other evidence of record[5] – for rejecting the opinions of plaintiff's treating physicians and plaintiff's pain testimony, because much of the testimony the ALJ attributes to Dr. Brovender does not appear in the transcript. Dr. Brovender's testimony – in its entirety – is recorded as follows:

> ALJ: . . . Now let me ask, let me talk to Dr. Brovender, question him as to, you know, based on the x-rays, which is all we have, what all we have, and the amount of medication that he's taking as being prescribed by the primary doctor, care doctor, you know, if one could be – well, let me just get his opinion. Dr. Brovender, have you been able to hear everything pretty well?
>
> ME: I have.
>
> \* \* \* \* \*
>
> Q   Do you have copies of those x-rays of the neck that were done in January '07 and the x-rays of the back that were done in February '05?
>
> A   Yes.
>
> Q   Okay.  Now tell me based on your reading of those x-rays, what, how

---

[5] The ALJ did not rely exclusively on Dr. Brovender's testimony. However, his rejection of the claimant's pain testimony and the treating doctor's assessments were based primarily on the medical expert's testimony. (See R. 22-23). The ALJ indicated that, at the hearing, he was inclined to "give the claimant the benefit of the doubt regarding his subjective complain[t]s of pain," but that "upon further reflection the undersigned has given great weight to the opinions of Dr. Brovender, an orthopedist, who is more qualified to assess orthopedic complaints than a family doctor who appeared to be responding solely to the claimant's request for narcotic pain medication." (R. 23).

significant are they?

A   Not very.

Q   I didn't hear you.

A   (No audible response.)

Q   Let me get a little closer since I moved the phone a little ways. What, what was your answer?

A   (INAUDIBLE) pain. In 7F [Dr. Collin's records] is his medication, in 6F [Dr. Pantaleone's questionnaire] is a treating assessment, as far as that being he went to the emergency room (INAUDIBLE) degeneration of disk in C6-7. On 4F [Dr. Collin's questionnaire] he has a disability questionnaire, on 3F [report of consultative examination by Dr. Jani],[6] page 105 is that he had neck and back pain and his combination was normal. The x-rays suggest, 2F, page 37 [report of 2/24/05 MRI] it talks about that he has (INAUDIBLE). At 1F he had several changes in the, I guess he had cumulus level at L5.

Q   Well, what, what exhibit is that where he had the solo changes?

A   1F.

Q   1F.

ALJ: Are you hearing everything that Dr. Brovender is saying, counsel?

ATTY: Bits and pieces. I get the gist of his testimony, Your Honor.

ALJ: All right. He said, basically he's saying that he sees those things that can form these based on the x-rays and he's citing to me Exhibit 7F, 6F, which was a pain assessment, 5F was the, were they treated his fractured nose in January of '07 and took x-rays of his neck. Four F is a disability questionnaire probably completed by Dr. Pancleon and then I think he was treated in 3F, August 5, '05 it looks like, if I wrote it down correctly, for neck and back pain.

---

[6] Dr. Jani, an internist, performed a consultative examination on August 5, 2005. After considering the EMG/NCV and MRI results and his physical examination findings – which included no evidence of muscle spasm, negative straight leg raising, and motor strength of 5/5 bilaterally in upper and lower extremities – he concluded that plaintiff has no restrictions on sitting, can stand or walk at least six hours without restrictions, and can lift and carry 100 pounds occasionally and 50 pounds frequently. (R. 127-29).

And then in 2F, page 37 he tells some one that he injured his back 40 years ago, then the doctor also refers to what –

BY ADMINISTRATIVE LAW JUDGE:

Q   In 1F, doctor, you said there were subtle changes, is that what you said?

A   Do you want me to read it out to you?

Q   Yeah, read, read it again please so that the attorney in Montgomery can hear it better.

A   Oh, okay.  This is from a Dr. Richardson.  Normal changes are noted with L5 and 1-S1 nerve irritation and it appears – there's not evidence, very little changes (INAUDIBLE).

Q   Are you still there, doctor?

A   Yes, I'm here.

Q   Okay.  All right, so in 1F they literally don't do any, the Dr. Ruman (Phonetic) Richardson, or Richards, whatever his name is, Richardson.

A   Did the EMG studies.

Q   Okay.  And they didn't show any nerve root irritation?

A   There were several changes.

Q   Several nerve root, subtle changes, okay, all right.  Now, the let me get some of my notes once, just a second.

*   *   *   *   *

BY ADMINISTRATIVE LAW JUDGE

Q   Dr. Brovender, Risperdal for free (Phonetic)?

A   That's pretty much.

Q   It's a muscle relaxant, okay, and hydrocodone –

A   It's a narcotic.

Q   – is a narcotic, it, it, hydrocodone, A-Pac, 7.5, whatever that is, then there's something –
A   Can get addicted.

Q   Pardon me?

A   Can get addicted.

\* \* \* \* \*

REEXAMINATION OF MEDICAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q   Okay, all right. Dr. Brovender, of the 100 kinds of, with the, you said it had what in it?

A   It's, it's a narcotic, it's a form of codeine.

Q   Okay, okay. And he takes the, it three times a day, would you, is that for pretty strong pain or moderate pain or mild pain?

A   No, pain is subjective, Your Honor?

Q   Yeah, I know it is.

A   That's, I can't –

Q   But I mean if, in the medical –

A   That's a high dose.

(R. 173-79). The ALJ excused Dr. Brovender without taking further testimony from him. (R. 183).

Even taking into account obvious transcription errors, the transcript simply does not show that Dr. Brovender testified, as indicated in the ALJ's decision: (1) "that the claimant's objective medical findings did not corroborate the degree of severity that he was alleging"

11

(R. 22); (2) that he "did not feel the relative mild objective findings warranted" plaintiff's treatments with narcotic medication on a fairly long term basis (R. 22); or (3) that he was "not at all impressed with the objective medical findings" (R. 23).  Additionally, nowhere in the recorded testimony does Dr. Brovender express his conclusion that "the claimant's subjective complaints far exceeded the objective medical tests that had been performed on Mr. Anderson."  (R. 23).  While the ALJ may have written his opinion from his own notes, and while Dr. Brovender's actual testimony may have more closely approximated what is set forth in the ALJ's decision than what is reflected by the hearing transcript, the court's review is necessarily limited to the transcript.  That transcript does not provide substantial evidence to support the ALJ's stated reason for rejecting the opinions of plaintiff's treating physicians. Because the hearing transcript does not include the testimony on which the ALJ so heavily relies, this matter must be remanded to the Commissioner for further administrative proceedings.[7]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED[8] and this action REMANDED for further proceedings consistent with this opinion.

Done, this 15th day of April, 2010.

---

[7] The court does not here express any opinion regarding the ALJ's ultimate conclusion as to plaintiff's disability.

[8] Sentence six remand is not appropriate because: (1) the Commissioner did not move for remand; and (2) the Commissioner has filed an answer.  See 42 U.S.C. § 405(g).

12

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE